IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-3230

UNITED STATES OF AMERICA,

    Plaintiff,

v.

APPROXIMATELY $250,101.00 IN UNITED STATES CURRENCY;

    Defendant.

_____

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***
_____

    The United States of America ("United States"), by and through United States Attorney Cole Finegan and Assistant United States Attorney Elizabeth Young, pursuant to Supplemental Rule for Admiralty, Maritime and Asset Forfeiture Claims G(2), states:

## JURISDICTION AND VENUE

    1.    The United States has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. §§ 981(a)(1)(A) and (C), 31 U.S.C. § 5317, and 21 U.S.C. § 881, seeking forfeiture of defendant property based upon violations of 18 U.S.C. §§ 1956 and 1957, 31 U.S.C. § 5316, and 21 U.S.C. § 801, *et seq.* This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

    2.    Venue is proper under 21 U.S.C. § 881(j) and 28 U.S.C. § 1395, as the defendant property is located, and some of the acts described occurred in the District of Colorado.

1

## DEFENDANT PROPERTY

3. Defendant property is more fully described as approximately $250,101.00 in United States currency seized from Mario Alberto Guzman Alvarado[1] and Kevin Matamoros Diaz[2] at the Mesa County Detention Facility on March 14, 2022 (the "defendant currency"). The defendant currency is in the custody of the United States Marshals Service.

## FACTUAL BASIS FOR FORFEITURE

4. Except as otherwise noted, the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

**A.    Background**

5. In 2019, agents with the Drug Enforcement Administration ("DEA"), along with local law enforcement, conducted an investigation into the heroin drug trafficking organization operated by Jorge Melendez[3]. Melendez was identified as the source of supply for heroin from Denver, Colorado, to Grand Junction, Colorado, where the heroin was distributed in street-level quantities.

6. Melendez was previously charged with drug related offenses and convicted in Denver of possession of a controlled substance over 1 gram in 2010 and possession with intent to distribute a controlled substance in 2019.

---

[1] Mario Alberto Guzman Alvarado is a citizen of Honduras who was residing in either Denver or Aurora, Colorado in March 2022 when the defendant currency was seized.

[2] Kevin Matamoros Diaz is a citizen of Honduras. In March 2022, he flew into the United States from Honduras using his Honduran passport. More specifically, he flew from Honduras to Houston, Texas. He then flew from Houston to San Francisco, California. In San Francisco, he picked-up a rental car and drove to Denver, Colorado. As explained in more detail below, he then drove from Denver to Grand Junction, Colorado, where the defendant currency was seized.

[3] Melendez is a citizen of Mexico who was in the United States illegally in 2019. He was residing in Aurora, Colorado in 2019.

7. The initial 2019 investigation consisted of a controlled purchase of heroin and cocaine from Melendez utilizing a confidential source. The investigation continued and Melendez was subsequently the target of a wiretap investigation by the Western Colorado Drug Task Force ("WCDTF") and the DEA.

8. During the course of the wiretap, Melendez made numerous incriminating statements and several drug deals between Melendez and his customers were observed by law enforcement officers.

9. During one of the conversations, law enforcement officers heard Melendez inform a subordinate dealer that they should not be so trusting because they are drug dealers.

10. The investigation led to the arrests of numerous individuals as well as the arrest of Melendez for conspiracy to distribute controlled substances.

11. On November 5, 2019, agents executed a search warrant at Melendez's residence at 16415 East 14th Place, #203, Aurora, Colorado. During the search, agents seized $5,500.00 in United States currency, more than a dozen cell phones, drug paraphernalia, approximately 2.2 pounds of heroin, and approximately 88 grams of cocaine.

12. Based on my training and experience, Melendez was a significant dealer of heroin in Colorado. Two pounds of heroin, at least a significant portion of which was likely destined for the Western Slope of Colorado, would supply a significant number of customers in the community. After being divided into street-level quantities, the heroin would have sold for a total of approximately $22,000 to $30,000 and the cocaine would have sold for a total of approximately $6,000 to $8,000.

13. Melendez was arrested in November 2019 for distributing a controlled substance and conspiracy to distribute a controlled substance. *People of the State of Colorado v. Jorge Alberto Melendez*, 2019CR2141, is pending in Mesa County Colorado. Melendez is incarcerated at the Mesa County Detention Facility ("MCDF") in Grand Junction, Colorado, pending trial. His bond was set at $250,000.00.

**B.    Melendez's Telephone Calls**

14. Following his arrest, Melendez spoke to a relative, Gladys Diaz, via telephone from the MCDF. A frequent subject they discussed was how Melendez could come up with the money for his $250,000 bond and how it could be paid.

15. On November 6, 2021, Melendez and Gladys spoke on the telephone. They discussed the possibility of a potential prison sentence if he took his case to trial. Melendez told Gladys that he was facing a potential sentence of 28-32 years. They also discussed his bond. Melendez and Gladys talked about delaying his criminal case so Gladys could sell her house to raise the bond money. In reference to the bond, Melendez told Gladys that when he was out he would be in Honduras (where Gladys lived), and he would be able to repay her if she put up the bond money.

16. The implication is that Melendez would leave the United States before his criminal trial and, therefore, Gladys would lose any money she put up for Melendez's bond.

17. On November 7, 2021, Melendez and Gladys again discussed the bond. Melendez told Gladys that he had some people who would help him. Gladys asked Melendez how much he would be able to borrow. Melendez told her he could borrow 100 (meaning $100,000) in Denver and 100 (meaning $100,000) from Gladys in Honduras.

He suggested that Gladys should take out a $50,000 loan to cover the rest of the money he needed so there would be a paper trail for the money. Gladys agreed. Melendez suggested a ten-year loan. He then suggested that Gladys might be able to gather up $150,000 of the funds in Honduras and the other $100,000 in the United States.

18. On November 12, 2021, Melendez and Gladys spoke again. Gladys told Melendez that she was going to the bank to find out what the monthly payments would be if she obtained a loan. Melendez told Gladys that he was no longer thinking about going to prison because Gladys gave him hope. Melendez also said that he knew he would be able to pay Gladys back when he was out. They also discussed Gladys depositing $300 into Melendez's account at MCDF. Melendez said that if Gladys had Maritza deposit the $300, Melendez could use it to purchase his flight to Mexico.

19. Again, the implication was that if Melendez's bond was paid, he would flee the United States.

20. On November 28, 2021, Melendez and Gladys spoke again. They discussed the fact that Gladys had everything in Honduras, but was unable to bring the money to the United States. They also discussed Melendez's belief that if he was deported from the United States, he could come back to Grand Junction in five years and turn himself in for the criminal charges pending against him, but the State of Colorado—he believed—would no longer be able to use the evidence it had collected against him. Therefore, he told Gladys he would get a lighter sentence and, after serving it, he would then also be able to get the $250,000 back because it was under her name.

21. On December 5, 2021, Melendez asked Gladys if there was a way to bring money in via an airplane. They also discussed whether someone could move the money

5

from Honduras to the United States. Melendez told Gladys that someone would ask how they got the money. Gladys told Melendez that he knew some of the money would come from Honduras from the bank. Gladys said that they would need to figure out what would be needed.

22. On December 5, 2021, Melendez and Gladys held a second telephone conversation in which they again discussed paying the bond. Melendez informed Gladys that the paper would arrive over there in three days and everything could start after that. Melendez and Gladys further discussed whether someone other than Gladys could pay the bond instead of her. Gladys told Melendez that she would figure out someone who could pay it instead of her. Melendez told Gladys that there was someone locked up with him who offered to help him. The other inmate's wife was a doctor and the money could be deposited into her account. Gladys disagreed with this idea. Gladys told Melendez that she trusted Eduardo. Melendez told Gladys that it was a good thing that he remembered to tell Gladys that it would be better if she did not pay the bond so she could stay away from the situation. Gladys agreed. Later in the conversation, Melendez said he did not spend too much money now that there was hope of him getting out. Gladys agreed. Melendez said the only problem would be when he gets to immigration. He said it was the least of his worries because he would be able to get some clothes in Mexico and would get a hotel right away. Gladys warned him to be careful.

23. On December 12, 2021, Melendez and Gladys discussed the bond again. Specifically, they discussed the fact that the funds should not be deposited into Melendez's account and then paid from that account because people might question where the money came from. They then discussed other individuals in whose names the

money could be deposited, including those who had connections in the United States. During this conversation Melendez and Gladys cautioned each other about what they said because Melendez believed that people were listening to his conversations.

24. On December 25, 2021, Melendez spoke to an unknown individual via telephone. Melendez told the individual that everything might happen in January and he would be able to be out. Melendez asked the individual to help Gladys get Melendez out. Melendez also said he was nervous about how they were going to handle things because they were in Honduras and his problems were in the United States. The telephone was passed to another individual who spoke to Melendez, and then the telephone was passed to Kevin Matamoros Diaz. Kevin Matamoros Diaz told Melendez that he had contacts at some banks so everything was possible. Melendez asked Kevin if Kevin could send money from Honduras to the United States. Kevin said he could because he had a friend who worked at a bank who would help him.

25. On January 15, 2022, Gladys told Melendez that she did not have good news. She told him that she spoke to Nora who told Gladys that someone had to be in the United States to bail Melendez out. She also told Melendez that once he was bailed out he would still need to attend court and keep checking in. Gladys also told Melendez that he would only get his money back after court and that if he left he would lose the money. Melendez asked what the problem with getting him bailed out was. They discussed what Gladys had been told. Melendez told her that if they went through a bondsman they would only need to pay ten percent of the $250,000, but he was going to pay the full amount and not use a bondsman. Melendez said if the full amount was paid and he got deported, then he would lose the money unless he came back and fought for

7

the money. Melendez told Gladys that she had the wrong information since he was going to pay the full amount. Melendez asked Gladys if she was able to gather the rest of the money. Gladys said no and told Melendez that the bank was not loaning them the full amount. Melendez reiterated that if he paid the full amount of the bond instead of using a bondsman, he did not have to keep checking in after he was released.

26.    On January 18, 2022, Melendez and Gladys discussed whether the bond could be paid online. They then discussed whether the money was ready. Melendez said he thought the money was already in the bank and only needed to be retrieved. Gladys said no and told Melendez that the money needed to be converted into dollars and then it needed to be withdrawn. Gladys also said that she was working on trying to sell a car in Honduras.

27.    On January 24, 2022, Gladys told Melendez that she was busy buying candies with Brenda so she could sell them. They then discussed Melendez's wife getting some paperwork from Gladys. Gladys said that she mentioned to Melendez's wife that it might not be a good idea for Gladys and the wife to be talking too frequently. Gladys said she already spoke to Kevin and Maritza and she assured Melendez that everything was going to come out fine. Gladys said that Maritza was going to have a certificate. Melendez asked if the certificate would be accepted in the United States. Gladys said yes. Gladys told Melendez that all she needed to find out was if she (Gladys) would be able to pay at the window. Melendez said she could only pay at the window if they had a cashier's check. Gladys said Kevin offered to drop the check off. Melendez said it would be an additional 48 hours after the bond was paid before he was let out. Gladys said she spoke to Kevin to inform him that they might use his account to process the payment. Melendez said he

is glad that things are moving along. Melendez told Gladys that her business had prospered. She agreed and told him that it had been tough. She said she was looking for people to help her in Denver because she couldn't do it herself. Gladys said Kevin told her he would be able to help her.

28. On January 26, 2022, Gladys and Melendez discussed whether Gladys would be selling a car in Honduras. Gladys was not sure how much money she could get for it.

29. On February 19, 2022, Melendez asked Gladys if she was sending some packages. She confirmed that she was. Gladys told Melendez that on Monday she brought over the "cheese". They discussed Gladys' daughter and then the conversation turned to Melendez's friends not being willing to help him with his bond. Melendez asked for an update and Gladys said she couldn't speak about it much. She told Melendez that she needed someone in the United States to help her. She also told Melendez that she had gotten everything ready except for Erica's (Melendez's wife) side of things. Gladys asked Melendez when his court date was. He told her it was March 20th.

30. On March 10, 2022, Gladys wished Melendez a happy birthday. Melendez told Gladys that he was fine and calm because of what Gladys already knew. Gladys said that she hoped something would happen next week. They then engaged in a discussion in which they both spoke vaguely about something happening. Eventually, Melendez asked Gladys if it was happening on Thursday. Gladys said she wasn't going to tell Melendez. Melendez told Gladys that he needed to know because he needed to align things together. Gladys told Melendez that they were going to turn things in on Monday. Melendez asked if it was the upcoming Monday. Gladys said yes and told Melendez to

shut up. He reconfirmed if it was the upcoming Monday. Gladys said it was and they discussed her travel plans. Melendez asked Gladys if she was coming with Kevin. Gladys said yes. Melendez said it was a great birthday present to him.

31. On March 12, 2022, Melendez called Gladys and asked to speak to Kevin. Gladys said Kevin was about eleven hours out and was passing through Las Vegas. Melendez said that he understood now. Gladys told Melendez to be careful. Melendez asked Gladys if it would happen on Monday. Gladys said yes. Melendez told Gladys that he understood now and that Gladys was not messing around.

32. On March 12, 2022, Melendez and Gladys spoke again. Melendez asked Gladys where Kevin was. Gladys said he was about five hours away. Melendez asked if Kevin was in Colorado. Gladys said that the last time she spoke to Kevin he was in Utah. Gladys told Melendez that everything would be fine and he should not worry.

33. On March 13, 2022, Melendez asked Gladys how Kevin was. Gladys told Melendez that Kevin had arrived at one. Melendez referred to Kevin as "Gordo." Melendez asked Gladys if the vehicle had been rented. Gladys confirm that it had. They discussed an incident with the rented vehicle in which Kevin had hit a deer. Melendez asked Gladys where Kevin had come from. Gladys told him that Kevin came from San Francisco. Gladys then handed the telephone to Kevin. Kevin and Melendez discussed the incident with the deer and Kevin's arrival. Kevin told Melendez that everything was good. Melendez thanked Kevin and asked Kevin what time he would be heading out the next day. Kevin told Melendez it would be early because he needed to come back to fly out. Melendez told Kevin that he was nervous.

34. On March 14, 2022, Gladys asked Melendez if he was impatient. He said

yes. Gladys told Melendez that Kevin was headed over and would be to Grand Junction in about 40 minutes.

**C.     Seizure of Defendant Approximately $250,101.00 in United States Currency**

35.    On March 14, 2022, two men arrived at MCDF at around 9:00 a.m. with a large amount of United States currency in a backpack to post bond for Melendez. The two men were Mario Alberto Guzman Alvarado and Kevin Matamoros Diaz.

36.    The men were informed that MCDF could not accept that amount of cash and were directed to the Grand Junction Federal Credit Union, where the cash was counted by the credit union and totaled approximately $250,101.00. The money was held at the credit union pending investigation.

37.    Agents from the DEA, Homeland Security Investigations, and the WCDTF, arrived at MCDF to interview Matamoros Diaz and Guzman Alvarado.

38.    Agents interviewed Matamoros Diaz and Guzman Alvarado separately.

*Interview with Mario Alberto Guzman Alvarado*

39.    Guzman Alvarado told agents that Kevin Matamoros Diaz asked him to give Kevin Matamoros Diaz a ride to Grand Junction to help get Melendez out of jail.

40.    Guzman Alvarado then told the agents about a woman named Gladys Diaz, and said that Gladys asked Guzman Alvarado to bring Kevin Matamoros Diaz to Grand Junction to help pay bail for Melendez. He told agents that he was supposed to be paid one day's wages and gas for the drive to Grand Junction.

41.    Guzman Alvarado said that the previous Friday, Gladys Diaz asked him to go to a warehouse for United Airlines in Denver and pick up six boxes of goods and transport the six boxes back to an apartment around the area of Exposition, Aurora.

42. According to Guzman Alvarado, he did not know what was in the packages. He told agents that Gladys Diaz would send products from Honduras to America that she would sell, including Honduran candies and other items from Honduras.

43. Agents asked where the money came from and Guzman Alvarado said that early in the morning he picked up Kevin Matamoros Diaz from the apartment in Exposition, Aurora, where he had previously dropped the boxes off so that they could drive out to Grand Junction together. Guzman Alvarado said that at that time, Kevin Matamoros Diaz already had the backpack with the money inside.

44. Guzman Alvarado said the money did not belong to him and that he did not know where it came from.

*Interview with Kevin Matamoros Diaz*

45. Kevin Matamoros Diaz told agents that he flew from Honduras into Houston, Texas. He then flew from Houston to San Francisco, California. In San Francisco, he picked-up a rental car and drove to Denver, Colorado.

46. Matamoros Diaz said he went to an apartment in Aurora, Colorado, and met the owner of the apartment, Marlene. Matamoros Diaz told agents that Gladys Diaz stays at this apartment when she is in Denver.

47. When Matamoros Diaz arrived at the apartment in Aurora, Gladys Diaz was there and gave him the money in the backpack. Then, Matamoros Diaz got a ride from Guzman Alvarado to Grand Junction to post the bond for Melendez.

48. While the two men were being interviewed, a Mesa County Sheriff's Office Deputy conducted a K9 open air sniff of the car the two men arrived in. The K9 positively alerted to the odor of narcotics.

49. Agents then conducted a probable cause search of the car and found a receipt for the boxes from the United Airlines warehouse. Agents also found multiple envelopes, some with writing and some without, as well as empty plastic zip-lock baggies, which appeared to contain defendant approximately $250,101.00 in United States currency before the cash was counted and seized.

### D. Conclusion

50. Based on the foregoing, defendant approximately $250,101.00 in United States currency was brought into the United States from Honduras in violation of 31 U.S.C. § 5316 and 18 U.S.C. §§ 1956 and 1957 or was collected by Kevin Matamoros Diaz and/or Gladys Diaz from various associates of Melendez and Gladys Diaz, in which case the defendant currency is likely proceeds from violations of 21 U.S.C. § 801, *et seq.* In addition, based on the foregoing, the defendant currency was used to facilitate the commission of violations of 18 U.S.C. §§ 1956 and 1957.

51. Therefore, defendant approximately $250,101.00 in United States currency is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), 21 U.S.C. § 853, and 31 U.S.C. § 5317(c)(2).

### VERIFICATION OF JASON GREENFIELD
### SPECIAL AGENT, DRUG ENFORCEMENT ADMINISTRATION

I, Drug Enforcement Administration Special Agent Jason Greenfield, hereby state and aver under the pains and penalties of perjury that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein are true.

s/ [signature]
Jason Greenfield
Special Agent - DEA

## FIRST CLAIM FOR RELIEF

52. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

53. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or proceeds traceable to such an exchange in violation of 21 U.S.C. § 801, *et seq.*, and therefore is forfeitable to the United States pursuant to 21 U.S.C. § 881(a).

## SECOND CLAIM FOR RELIEF

54. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

55. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes property which was transported to a place in the United States from or through a place outside of the United States in violation of 31 U.S.C. § 5316, and is therefore forfeitable to the United States pursuant to 31 U.S.C. § 5317(c)(2).

## THIRD CLAIM FOR RELIEF

56. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

57. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes property that represents proceeds of some form of unlawful activity that was then involved in a financial transaction with the intent to promote the carrying on of specified unlawful activity or knowing that the transaction is designed in whole or in part to (i) conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity or (ii) to avoid a

transaction reporting requirement under State or Federal law in violation of 18 U.S.C. § 1956(a)(1), and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

## FOURTH CLAIM FOR RELIEF

58. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

59. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes a monetary instrument that was transferred, transmitted, or transported to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A), and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

## FIFTH CLAIM FOR RELIEF

60. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

61. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes a monetary instrument that was transferred, transmitted, or transported to a place in the United States from or through a place outside the United States with the knowledge that the funds involved represent the proceeds of some form of unlawful activity and knowing that the transfer, transmittal, or transportation is designed to (i) conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity or (ii) to avoid a transaction reporting requirement under State or Federal law in violation of 18 U.S.C. § 1956(a)(2)(B), and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and

(C).

## SIXTH CLAIM FOR RELIEF

62. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

63. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity that individuals knowingly attempted to utilize or did utilize in a monetary transaction in violation of 18 U.S.C. § 1957, and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

## SEVENTH CLAIM FOR RELIEF

64. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

65. By the foregoing and other acts, defendant approximately $250,101.00 in United States currency constitutes funds that individuals conspired to utilize to violate provisions of 18 US.C. §§ 1956 and 1957 in violation of 18 U.S.C. § 1956(h), and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

DATED this 15th day of December 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By: s/ *Elizabeth Young*
Elizabeth Young
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100

Fax: (303) 454-0402
E-mail: Elizabeth.Young2@usdoj.gov
*Attorney for Plaintiff*

17